# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

STORM ERIE                                                    CIVIL ACTION

VERSUS

NANCY HUNTER                                        NO. 21-00267-BAJ-RLB

## RULING AND ORDER

"Congress shall make no law respecting an establishment of religion[.]" U.S. Const. amend. I. Jurists still debate the outer limits of the Establishment Clause's reach, but its core guarantee is settled: "government may not 'make a religious observance compulsory.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2429 (2022) (quoting *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)).

In this case, the evidence shows that Defendant Nancy Hunter—a psychiatric aide at the Eastern Louisiana Mental Health System (ELMHS) in Jackson, Louisiana—compelled Plaintiff Storm Erie—a civil detainee confined at ELMHS—to attend a Christian worship service over his express objection and under threat of force. Now the Court must decide if this evidence withstands Ms. Hunter's qualified immunity defense at summary judgment. It does, for reasons set forth below.

## I.    BACKGROUND

### A. Summary Judgment Evidence

By Local Rule, the following facts are drawn from Ms. Hunter's Statement Of Uncontested Material Facts (Doc. 20-1), Mr. Erie's responsive Statement of Material Facts (Doc. 21-1), and the record evidence submitted in support of these documents.

ELMHS is Louisiana's only state-run forensic psychiatric hospital, serving all

64 Louisiana parishes. ELMHS's Secure Forensic Facility (SFF) in Jackson treats "residents" that are detained under civil commitment orders for mental illness or addictive disorders, including residents that have been determined to be incompetent to stand trial for criminal offenses, found not guilty of criminal offenses by reason of insanity, and transferred from state prisons. La. R.S. § 28:25.1.

Ms. Hunter, now retired, was a 30-year employee of ELMHS. (Doc. 21-1 at 7:10-9:9, *hereinafter* "Hunter Depo."). For the 15 years prior to her retirement, Ms. Hunter worked as a psychiatric aide in the SFF. (*Id.*). Ms. Hunter is Methodist, and attends church "[e]very first and third Sunday." (*Id.* at 10:7-11:13). In her own words, she "put[s] everything in the Lord's hands because the Lord said he looks high and low 24/7." (*Id.* at 35:24-25).

Mr. Erie is a civil detainee assigned to the SFF. For 17 years, Mr. Erie has identified as "an ephemeral existentialist." (Doc. 20-3 at 7:22-8:9, *hereinafter* "Erie Depo."). He believes in God, but does not associate with organized religion. (*Id.*)

To promote safety and security at the SFF, ELMHS requires that residents be supervised at all times, pursuant to a maximum 15:1 resident to staff ratio. (Doc. 20-1 at ¶¶ 3-4). There are no exceptions to these rules. Still, however, these rules may *not* be applied in a way that burdens residents' freedom of conscience. To the point, ELMHS policy *also* provides that SFF residents maintain the "[r]ight to refuse to attend religious services," that residents should "never [be] force[d]" to attend religious services, and that if a resident exercises his right to refuse attendance at a religious service, "ever[y] effort should be made to assist the [residents] who do want

2

to attend and leave the [residents] on the unit who do not want to attend." (Doc. 21-3 at 2, 12; *see* Doc. 20-4 at 17:10-19:16, *hereinafter* "Bertucci Depo."; *see also* Doc. 20-6 at 9:9-22, *hereinafter* "Boatner Depo.").

On January 9, 2021, Ms. Hunter and her supervisor, non-party Nurse Tonya Boatner, were the only ELMHS staff members assigned to supervise 26 residents in the SFF. (Doc. 20-1 at ¶¶ 5-6). Just before 10:00 a.m., Ms. Hunter made rounds, knocking on each residents' bedroom door and announcing "it's church time." (Hunter Depo. at 7:9-18, 14:17-15:9). Twenty-five SFF residents responded promptly, leaving their bedrooms and assembling without protest in the recreation hall for a Christian worship service. (*Id.* at 15:10-16:14, 17:8-18:11; *see also* Erie Depo. at 17:20-25).

When Ms. Hunter reached Mr. Erie's door, however, Mr. Erie objected, saying "I ain't going to church." (Hunter Depo. at 15:2-3, 17:9). Ms. Hunter knew of Mr. Erie's "right to refuse." (*Id.* at 23:12-13, 41:25-41:11). She also understood that Mr. Erie's right of refusal could be accommodated by notifying Nurse Boatner of Mr. Erie's objection, so that a staff member—Ms. Hunter, Nurse Boatner, or a security guard—could be assigned to sit outside Mr. Erie's door during the service, allowing Mr. Erie to remain in his bedroom. (*Id.* at 37:20-38:16). According to Nurse Boatner, however, Ms. Hunter "didn't even come to me regarding that statement from Mr. Erie." (Boatner Depo. at 14:3-8).[1] Instead, by Mr. Erie's account, Ms. Hunter "replied that I

---

[1] On this point, Nurse Boatner's testimony and Ms. Hunter's testimony are directly at odds. As indicated above, Nurse Boatner claims that Ms. Hunter never informed her of Mr. Erie's objection. (Boatner Depo. at 14:3-8). By contrast, Ms. Hunter states that she told Nurse Boatner of Mr. Erie's refusal to go to church (Hunter Depo. at 16:2-6), that Nurse Boatner confronted Mr. Erie and convinced him to change his mind, (*see id.* 23:10-16, 40:3-10), and that, in fact, Nurse Boatner ultimately led Mr. Erie from his room to the recreation hall, (*id.*

would have to go and if I refused to go she [Ms. Hunter] would get a guard to force me." (Erie Depo. at 12:11-21). According to Mr. Erie, Ms. Hunter added that "everyone would have to go to the church service" because she was the only psychiatric aide on the floor, and residents cannot go unsupervised. (*Id.* at 15:21-22, 16:5-13).

Facing a threat of physical force, *and* additional disciplinary action if he did not comply, (Erie Depo. at 42:8-43:10), Mr. Erie relented, leaving his bedroom and taking a seat in the rear of the recreation hall, as far as possible from the Reverend leading the worship service. (*id.* at 22:11-14). Mr. Erie's apprehension that he would be punished if he disobeyed Ms. Hunter's order was well-founded: SFF Director Gino Bertucci later confirmed that had Mr. Erie ultimately refused Ms. Hunter's order to proceed to the recreation hall, it would have been a "medium" rule violation punishable by "[l]oss of 50 percent of your [canteen] points, no canteen for one week and start your [good behavior] level over." (Bertucci Depo. at 45:17-46:16).

During the worship service—which consisted of prayer, hymns, and a sermon, (Hunter Depo. at 18:2-11)—Mr. Erie was allowed to wear headphones, but could still hear what was occurring, particularly after Ms. Hunter demanded that he lower the volume of his music. (Erie Depo. at 19:10-20:14; Hunter Depo. at 18:14-24).

Following the service, Mr. Erie immediately reported the morning's events to his attorneys who, in turn, promptly informed ELMHS's CEO, Hampton Lea, expressing concern that "Mr. Erie's Constitutional Rights under the First Amendment" were violated. (Doc. 21-1). At Mr. Lea's command, Director Bertucci

---

at 40:20-24). Plainly, this is a factual dispute that must be ironed out at trial.

conducted an investigation, which ultimately concluded that "there was [sic] other options [Ms. Hunter] could have use [sic] to locate other staff to stay with the [residents] who do not want to go to attend the religious services," and that Ms. Hunter's actions violated Mr. Erie's "[r]ight to refuse to attend religious services." (Doc. 21-3 at 1-2; *see* Bertucci Depo. at 17:10-19:8). Ms. Hunter received a written reprimand, (Doc. 21-3 at 1, 6), and, thereafter, *all* SFF staff were required to sign a memorandum expressly acknowledging residents' "right to decline attending religious services," (*id.* at 12).

### B. Procedural History

Mr. Erie initiated this action on May 10, 2021, alleging one constitutional claim against Ms. Hunter in her individual capacity: specifically, that his forced attendance at the January 9 worship service violated his Establishment Clause right to be free from compulsory religious observation. (Doc. 1 at ¶¶ 40-43).

On August 3, 2021, the State moved to dismiss Mr. Erie's claim on the basis of qualified immunity, arguing that Mr. Erie's constitutional rights were not clearly established, and that faced with "two options"—either prohibiting all residents from attending worship, or requiring all residents to attend—Ms. Hunter reasonably "exercise[d] her discretion in deciding to choose the latter." (Doc. 8-1 at 8). On March 23, 2022, this Court issued its Order rejecting Ms. Hunter's qualified immunity defense, ruling that the state of the law in January 2021 gave Ms. Hunter "fair warning" that her alleged actions violated the Establishment Clause, and that while Ms. Hunter's "motive/intent may ultimately bear on the outcome of Plaintiff's Establishment Clause claims—particularly if those motives are consistent with the

5

state's interest in maintaining safety of all ELMHS residents—such issues cannot be determined from the allegations of Plaintiff's complaint and require factual development." *Erie v. Hunter*, 593 F. Supp. 3d 374, 383 (M.D. La. 2022) (Jackson, J.).

Now, the record is developed, and the State moves for summary judgment, doubling down on its position that Ms. Hunter's actions are shielded by qualified immunity. Mr. Erie opposes the State's motion. (Doc. 21).

## II.    ANALYSIS

### A.    Standard

The summary judgment standard is well-set: generally, to prevail, the moving party must show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. 56(a). Here, however, the State invokes qualified immunity. Thus, the tables are turned, and Mr. Erie "bears the burden to demonstrate the inapplicability of the defense." *Rogers v. Jarrett*, 63 F.4th 971, 975 (5th Cir. 2023) (quotation marks omitted). To meet this burden, Mr. Erie must "(1) raise a fact dispute on whether his constitutional rights were violated by [Ms. Hunter's] conduct, and (2) show those rights were clearly established at the time of the violation." *Id.* (quotation marks omitted).[2] Still, when conducting the qualified

---

[2] The qualified immunity defense is the subject of multiple well-founded critiques, including that it tips the scales of justice too far in the State's favor. *E.g.*, *Jamison v. McClendon*, 476 F. Supp. 3d 386, 423 (S.D. Miss. 2020) (Reeves, J.) (reviewing the history and expansion of the qualified immunity doctrine, and calling for its elimination). Still, it remains "the law of the land." *Id.* at 409. But for how long? Recent groundbreaking scholarship from Professor Alexander A. Reinert of the Benjamin N. Cardozo School of Law shakes the very foundation of the qualified immunity doctrine. *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CAL. L. REV. 201 (2023). In his article, Professor Reinert shows that qualified immunity's doctrinal underpinning—that "no evidence" suggests that the Reconstruction Congress meant to abrogate common law immunities when it fashioned 42 U.S.C. § 1983—is a *fiction*, based entirely on a *scrivener's error* that conveniently removed a 16-word clause

immunity analysis, the Court views all evidence and makes all reasonable inferences

in the light most favorable to Mr. Erie. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

### B. Discussion

#### 1. Mr. Erie has raised a fact dispute on whether his constitutional rights were violated

The State haphazardly challenges the merits of Mr. Erie's constitutional claim,

---

from the published version of § 1983, which, put back in place, inarguably eliminates *all* such immunities. *Id.*

Judge Willett of the United States Court of Appeals for the Fifth Circuit recently summarized Professor Reinert's argument as follows:

[W]hat if Congress's literal language unequivocally negated the original interpretive premise for qualified immunity? Professor Alexander Reinert argues … that courts have been construing the wrong version of § 1983 for virtually its entire legal life. …

As passed by the Reconstruction Congress, … § 1983 … read this way:

[A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, *any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding*, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress....

The italicized language … explicitly displaces common-law defenses. The language that Congress passed makes clear that § 1983 claims are viable notwithstanding "any such law, statute, ordinance, regulation, custom, or usage of the State to contrary." The language is unsubtle and categorical, seemingly erasing any need for unwritten, gap-filling implications, importations, or incorporations. Rights-violating state actors are liable— period—*notwithstanding* any state law to the contrary.

*Rogers*, 63 F.4th at 979–80 (Willett, J., concurring).

It is far above this Court's pay grade to cast aside the qualified immunity doctrine here, particularly absent any argument from the parties. Indeed, at this point, only the Supreme Court can definitively "overrule" the defense. *Id.* at 981. For now, the undersigned commends Professor Reinert's scholarship, and joins Judge Willett's call for the Supreme Court to "definitively grapple with § 1983's enacted text and decide whether it means what it says—and what, if anything, that means for § 1983 immunity jurisprudence." *Id.*

arguing that the evidence cannot sustain an Establishment Clause violation because it is "undisputed that the purpose of keeping Plaintiff with the other residents in SFF Unit 1 under the circumstances that presented themselves was purely for the safety of Plaintiff and others." (Doc. 20-2 at 7).

Frustratingly, the State's argument fails to identify or apply *any* discernible constitutional standard by which to measure Mr. Erie's Establishment Clause claim, despite the availability of *multiple* options. *See, e.g., Croft v. Perry*, 624 F.3d 157, 165-70 (5th Cir. 2010) (discussing various tests for measuring alleged Establishment Clause violations). It goes without saying that constitutional claims, like all claims, are defined by standards comprised of discrete elements. *See id.* Thus, the Court must decide in the first instance which of the various Establishment Clause "tests" govern the facts at issue.

The choice is obvious. As explained in this Court's Order rejecting Ms. Hunter's qualified immunity defense at the pleading stage, for three-quarters of a century the Supreme Court has held that the State cannot "force … a person to go to … church against his will," nor punish a person for "non-attendance." *Everson v. Bd. of Ed. of Ewing Tw*, 330 U.S. 1, 15–16 (1947). Consistent with these rules, the Supreme Court's *Lee v. Weisman* decision—now thirty years old—distilled the Establishment Clause's irreducible "minimum" to this: "It is beyond dispute that … the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise[.]" 505 U.S. 577, 587 (1992). Just last year, the Supreme Court affirmed that this core guarantee remains firmly intact:

[G]overnment may not, consistent with a historically sensitive understanding of the Establishment Clause, make a religious observance compulsory. Government may not coerce anyone to attend church, nor may it force citizens to engage in a formal religious exercise. No doubt, too, coercion along these lines was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment.

*Kennedy*, 142 S. Ct. at 2429 (quotation marks, citations, and footnote omitted).

Taking its cue from the *Lee* decision, the Fifth Circuit has adopted the "Coercion Test" for determining whether state action coerces religious participation in violation of the Establishment Clause. *See Croft v. Perry*, 624 F.3d 157, 169-70 (5th Cir. 2010). In the custodial setting, this test assesses three factors: "first, has the state acted; second, does the action amount to coercion; and third, is the object of the coercion religious or secular?"[3] *Brown v. Collier*, 929 F.3d 218, 244 n.177 (5th Cir.

---

[3] The Fifth Circuit recently cited this version of the Coercion Test approvingly, but has not yet had occasion to apply it in the custodial setting. *See Brown*, 929 F.3d at 244 & n.177. By contrast, the Seventh, Eighth, Ninth, and Tenth Circuits have expressly adopted the three-factor Coercion Test as the appropriate constitutional yardstick for prison-based Establishment Clause claims alleging "[coercion], under threat of meaningful penalties, to attend religious meetings." *Kerr v. Farrey*, 95 F.3d 472, 479 (7th Cir. 1996); *see Jackson v. Nixon*, 747 F.3d 537, 541-542 (8th Cir. 2014); *Inouye v. Kemna*, 504 F.3d 705, 713 (9th Cir. 2007); *Janny v. Gamez*, 8 F.4th 883, 908 (10th Cir. 2021), *cert. dismissed*, 142 S. Ct. 878 (2022). The First, Second, Third, and Sixth Circuits have cited it with approval. *See Marrero-Mendez v. Calixto-Rodriguez*, 830 F.3d 38, 47 (1st Cir. 2016);*Warner v. Orange Cnty. Dep't of Prob.*, 115 F.3d 1068, 1075 (2d Cir. 1996); *Nelson v. Horn*, 138 F. App'x 411, 414 (3d Cir. 2005); *United States v. Logins*, 503 F. App'x 345, 353 n.4 (6th Cir. 2012). Based on the weight of these persuasive Circuit authorities, and the actual facts presented here, the Court finds that the Coercion Test is the appropriate measure of whether Mr. Erie has raised a fact dispute establishing a viable Establishment Clause claim.

To clear any confusion, the Court expressly acknowledges that it is applying a version of the Coercion Test developed for the prison setting, *without* modification, despite the fact that Mr. Erie is a civil detainee who may be entitled "to more considerate treatment" than a convicted prisoner. *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982), *but see Hare v. City of Corinth, Miss.*, 74 F.3d 633, 647 (5th Cir. 1996) (observing that the Supreme Court "has cast doubt on the vitality of" the distinction between criminals and civil detainees). To the extent either side benefits from the Court's selection of the prison-based Coercion Test, it is obviously the *State*, because (again) Mr. Erie's claims may yet deserve more deferential

2019) (quoting *Jackson v. Nixon*, 747 F.3d 537, 541-542 (8th Cir. 2014)); *e.g.*, *Janny v. Gamez*, 8 F.4th 883, 905-911 (10th Cir. 2021), *cert. dismissed*, 142 S. Ct. 878 (2022) (applying Coercion Test to parolee's claim that he was coerced to attend Alcoholics Anonymous/Narcotics Anonymous (AA/NA), a faith-based substance abuse program, in violation of the Establishment Clause (discussing authorities)).

Running the summary judgment evidence here through the Coercion Test is a straightforward endeavor that yields an obvious result.[4] First, it is undisputed that Ms. Hunter acted for the State when she ordered Mr. Erie to attend the worship service. *E.g.*, *Kerr*, 95 F.3d at 479 (prison officials act for the State when they order detainees to attend religious programs, even programs delivered by private parties).

Second, Ms. Hunter's order obviously amounts to coercion, a point the State all but concedes. (Doc. 20-2 at 7 ("[I]t is unfortunate that Mr. Erie attended a religious service he did not wish to attend.")). Indeed, Ms. Hunter's express threat of force and implicit threat of disciplinary action—lost canteen privileges and demoted rank on ELMHS's disciplinary rubric—is *precisely* the kind of "coercion" that the Establishment Clause was intended to protect against, under even the most skeptical view. *See Lee*, 505 U.S. at 640 (Scalia, J., dissenting) ("The coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy … *by force of law and threat of penalty*." (emphasis in original)); *accord Town of*

---

treatment than those of a convicted prisoner. *Youngberg*, 457 U.S. at 321–22.

[4] Having failed to identify any alternative standard, the State waives any objection to application of the Coercion Test here. *See Doe v. Bd. of Supervisors of Univ. of Louisiana Sys.*, --- F.Su3d ----, 2023 WL 143171, at *17 n.13 (M.D. La. Jan. 10, 2023) (Jackson, J.).

*Greece, N.Y. v. Galloway*, 572 U.S. 565, 608 (2014) (Thomas, J., concurring in the judgment); *Shurtleff v. City of Bos., Massachusetts*, 142 S. Ct. 1583, 1609 (2022) (Gorsuch, J., concurring in the judgment); *e.g.*, *Kerr*, 95 F.3d at 479 ("meaningful penalties" sufficient to satisfy the coercion element include re-classification to a "higher security risk category" and "adverse notations" in a detainee's record).

Third, the "object" of Ms. Hunter's coercion was obviously religious, because whatever the denomination, a Christian worship service is "substantially based in religion, premised as it is on belief in a higher power." *E.g.*, *Janny*, 8 F.4th at 907 (programming founded in monotheistic beliefs has a religious "object"). Having carried his burden to create a fact dispute as to each element of his Establishment Clause claim, Mr. Erie easily overcomes the first prong of Ms. Hunter's qualified immunity defense. *See Rogers*, 63 F.4th at 975; *e.g.*, *Janny*, 8 F.4th at 905-911 (fact disputes defeated parole officer's qualified immunity defense to parolee's claim that he was unlawfully forced to participate in NA/AA meetings (discussing authorities)).

The State does not address any of the Coercion Test factors, arguing instead that Mr. Erie's Establishment Clause claim fails because Ms. Hunter's "purpose … was purely for the safety of Plaintiff and others." (Doc. 20-2 a 7). Without expressly saying so, the State's position appears to be that Mr. Erie's right to be free of compulsory religious observance must necessarily yield to content-neutral "practices … needed to preserve internal order and discipline and to maintain institutional security" at ELMHS. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *accord Turner v. Safley*, 482 U.S. 78, 89-91 (1987).

Not so fast. First, Ms. Hunter's "purpose"—or subjective *intent* for ordering Mr. Erie's attendance at the worship service—is not a discrete element of an actionable Establishment Clause claim under the Coercion Test, which, again, asks only whether (1) the state acted, (2) the action amounts to coercion, and (3) the object of the coercion was religious or secular. *Brown*, 929 F.3d at 244 n.177.

Second, even assuming that Ms. Hunter's motivation *is* relevant to the merits of Mr. Erie's Establishment Clause claim, whether Ms. Hunter acted "purely" in pursuit of institutional safety is plainly a contested issue, thus precluding summary dismissal. Why? Because Mr. Erie has developed substantial evidence creating a genuine fact dispute regarding whether Ms. Hunter's actual "purpose" was religious or secular when she ordered him to go to church.

Ms. Hunter's order to attend the worship service was not in response to any imminent safety or security concern. To the contrary, it came in the absence of any disturbance on the floor, when the SFF's 26 residents were in their bedrooms. Even after Ms. Hunter issued her command, the residents responded in an orderly fashion: 25 promptly left their rooms and assembled in the recreation hall without incident; Mr. Erie peaceably voiced his objection, as was his right under ELMHS policy. At the time Mr. Erie objected to attending church, Ms. Hunter admittedly knew of Mr. Erie's right to abstain, and also knew that to accommodate Mr. Erie's objection, ELMHS policy required her to seek assistance from Nurse Boatner so that alternative arrangements could be made allowing him to stay in his room. Nurse Boatner testified, however, that Ms. Hunter never approached her regarding Mr. Erie's

objection, and Mr. Erie testified that, instead, Ms. Hunter immediately threatened to get a security guard to force him to church. These events are corroborated by Director Bertucci's internal investigation report, which concluded that "there was [sic] other options [Ms. Hunter] could have use [sic] to locate other staff to stay with the [residents] who do not want to go to attend the religious services," and that Ms. Hunter's actions violated Mr. Erie's "[r]ight to refuse to attend religious services." (Doc. 21-3 at 1-2; *see* Bertucci Depo. at 17:10-19:8). On top of all this, Ms. Hunter is plainly a devout person whose Christian faith cannot be cleanly separated from her on-the-job conduct. This much is clear from her deposition, where, after being confronted with a prior example of "unprofessional" workplace behavior, she stated spontaneously that she "put[s] everything in the Lord's hands because the Lord said he looks high and low 24/7." (Hunter Depo. at 35:24-25).

In sum, Mr. Erie's evidence shows that Ms. Hunter knowingly and intentionally ordered him to attend a Christian worship service despite ELMHS's policy expressly allowing residents to opt-out, under circumstances establishing a reasonable inference that she favored religion over non-religion, violating "that central Establishment Clause value of official religious neutrality." *McCreary Cty., Ky. v. Am. C.L. Union of Ky.*, 545 U.S. 844, 860, (2005). The upshot is that Mr. Erie has (again) shown a fact dispute on the issue of Ms. Hunter's "purpose" for ordering him to attend church, defeating summary judgment. *See Heaney v. Roberts*, 846 F.3d 795, 802 (5th Cir. 2017) (normal summary judgment rules apply to determinations of "improper motive" under the qualified immunity analysis (citing *Crawford-El v.*

*Britton*, 523 U.S. 574, 585 (1998)); *accord Heaney v. Roberts*, 147 F. Supp. 3d 600, 609 n. 9 (E.D. La. 2015) (Zainey, J.) (explaining that no "special rule … protect[s] a defendant's right to qualified immunity in cases involving improper motivation— cases that would frequently involve a disputed issue of fact that would preclude summary adjudication.").

### 2. Mr. Erie's constitutional rights were clearly established at the time of the violation

"The 'clearly established' prong is difficult to satisfy." *Cunningham v. Castloo*, 983 F.3d 185, 191 (5th Cir. 2020). Indeed, this prong "is better understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendant was objectively unreasonable in the light of that then clearly established law." *Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 306 (5th Cir. 2020).

Whether a constitutional right was "clearly established" at the time of the alleged violation is most often determined by reference only to binding Supreme Court and Fifth Circuit authority, though sometimes a "consensus of cases of persuasive authority" from other Circuits is "sufficient to compel the conclusion that no reasonable officer could have believed that his or her actions were lawful." *See McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002) (quoting *Wilson v. Layne*, 526 U.S. 603, 604 (1999)). The "salient question" is whether the state of the law at the time of the alleged violation gave the defendant "fair warning" that her alleged conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

As a best practice, plaintiffs seeking to overcome the "clearly established"

prong will highlight "cases of controlling authority in their jurisdiction at the time of the incident which clearly established the rule on which they seek to rely." *McClendon*, 305 F.3d at 329 (quoting *Wilson*, 526 U.S. at 617). Ideally, such cases involve "fundamentally similar" facts. *Hope*, 536 U.S. at 741. But this is *not* the only recipe for success. *Id.* Albeit rare, sometimes the constitutional violation under review is just so obvious that *any* reasonable official would know that "their conduct violates established law even in novel factual circumstances." *Id.* Put differently, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Id.*

This is the "obvious" case. It boils down to a simple question: In January 2021, was the caselaw clear that a state employee cannot compel a civil detainee to attend a Christian worship service over his express objection and under threat of penalty. The Supreme Court's answer, which has remained the same for 75 years, is direct and categorical: The State "may not make a religious observance compulsory." *Zorach*, 343 U.S. at 314. This first principle of First Amendment law reflects the Founders' understanding of what it meant to protect citizens' freedom of conscious. *See, e.g., Lee*, 505 U.S. at 640–642 (Scalia, J. dissenting); ("The coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy … *by force of law and threat of penalty*."); *Town of Greece*, 572 U.S. at 608-610 (Thomas, J., concurring in the judgment) (discussing coercion and historical hallmarks of an established religion); *Shurtleff*, 142 S. Ct. at 1608-1610 (Gorsuch, J.,

concurring in the judgment) (same); 1 Annals of Cong. 730–731 (1789) (Madison explaining that the First Amendment aimed to prevent one or multiple sects from "establish[ing] a religion to which they would compel others to conform"); M. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 WM. & MARY L. REV. 2105, 2144–2146 (2003).

And, again, this principle has been stated so many times and in so many contexts that *thirty years ago* it was already "beyond dispute that … the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise[.]" *Lee*, 505 U.S. at 587 (quotation marks omitted). As recently as June 2022, the Supreme Court paused to emphasize this constitutional rule once more, in equally categorical terms:

> [G]overnment may not, consistent with a historically sensitive understanding of the Establishment Clause, make a religious observance compulsory. Government may not coerce anyone to attend church, nor may it force citizens to engage in a formal religious exercise. No doubt, too, coercion along these lines was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment.

*Kennedy*, 142 S. Ct. at 2429 (quotation marks and citations omitted).

True, this constitutional rule has not been previously applied to "fundamentally similar" facts as those at issue here, possibly because such obvious Establishment Clause violations are (thankfully) rare, and, when they occur, are not litigated to this end. But this does not make Ms. Hunter's unconstitutional conduct any less clear, for at least two reasons. First, as set forth, a robust body of persuasive authority from other Circuits establishes that even compelled participation in nonsecular 12-step substance abuse programs runs afoul of the Establishment

Clause. *Kerr*, 95 F.3d at 480; *see supra* n.7. If detainees cannot be forced to participate in NA and AA because these programs are founded in the "monotheistic idea of a single God," *id.*, plainly detainees cannot be ordered to attend an *actual* Christian worship service.

Second, this constitutional rule is so ingrained in the fabric of daily American life that it is expressly written into ELMHS's policies. (Doc. 21-3 at 1-2; *see* Bertucci Depo. at 17:10-19:8). Moreover, at the time Ms. Hunter ordered Mr. Erie to attend church, she *knew* she was violating Mr. Hunter's "right to refuse to attend religious services," *notwithstanding* the SFF's general policy of maintaining a 15:1 patient to staff ratio. (Hunter Depo. at 23:12-13, 37:20-38:16, 41:25-41:11).

The sum of the summary judgment evidence here is that Ms. Hunter knew of Mr. Erie's "right to refuse" when she ordered him to attend church. (*Id.* at 23:12-13, 41:25-41:11). She also knew that ELMHS policy required her to accommodate Mr. Erie's right of refusal. (*Id.* at 37:20-38:16). Instead, by Mr. Erie's account, Ms. Hunter told him "if I refused to go she would get a guard to force me." (Erie Depo. at 12:11-21). Under the same circumstances, any reasonable state employee would know— and, in fact, Ms. Hunter *did* know—that she could not force Mr. Erie to attend the worship service against his will. *Lee*, 505 U.S. at 587; *Zorach*, 343 U.S. at 314; *Everson*, 330 U.S. at 15–16. Mr. Erie has carried his burden to show that the law was clearly established at the time he was forced to attend the January 2021 worship service over his express objection, and that Ms. Hunter's actions were "objectively unreasonable in the light of that then clearly established law." *Powers*, 951 F.3d at

306. Ms. Hunter's qualified immunity defense fails.

The State makes no attempt to engage with *Lee's* prohibition against compelled participation in religious exercise. Instead, the State reverts to its position that, on January 9, 2021, Ms. Hunter faced a binary choice: either compel Mr. Erie's attendance at the worship service, or "refuse[] to allow the 25 other patients in SFF unit 1" to attend the service, thereby violating "their own free exercise rights." (Doc. 20-2 at 8). And because the Supreme Court has rejected "a 'heckler's veto' which would allow religious activity to be proscribed based upon [Mr. Erie's] perception or discomfort," it was reasonable for Ms. Hunter to choose an "incidental infringement" on Mr. Erie's rights in favor of "maintain[ing] the 15-to-1 ratio" and allowing "two dozen of his fellow patients [to exercise] their own religious rights." (*Id.*).

This argument fails on multiple fronts. First, no reasonable official would confuse this case with a "heckler's veto" case.[5] Mr. Erie is not challenging ELMHS's

---

[5] When the Supreme Court coined the term "heckler's veto," it was faced with a wholly different Establishment Clause claim: specifically, whether a school district could lawfully prevent a private Christian club from using school facilities after hours, based, in part, on the district's concerns that non-Christian schoolchildren would believe that the district endorsed the club and feel pressure to join. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001). In this scenario, the Supreme Court rejected the school district's invitation to "assum[e] that any risk that small children would perceive endorsement should counsel in favor of excluding the Club's religious activity," and "decline[d] to employ … a modified heckler's veto, in which a group's religious activity can be proscribed on the basis of what the youngest members of the audience might misperceive." (*Id.*). There is simply no comparison between the potential for peer pressure at issue in *Good News Club*, and the actual threat of physical force at issue here. Put differently, even the most ardent skeptic of the Establishment Clause's reach would concede that compelled attendance at a Christian worship service under threat of physical force is an entirely different category of constitutional concern than abstracted psychological pressures to attend after-school Christian programming. *See id.* at 221 (Scalia, J., concurring) ("As to coercive pressure: Physical coercion is not at issue here; and so-called 'peer pressure,' if it can even be considered coercion, is, when it arises from private activities, one of the attendant consequences of a freedom of association that is constitutionally protected." (citations omitted)); *accord Lee*, 505

practice of allowing weekly worship services in the SFF recreation hall, and there is no evidence whatsoever that Mr. Erie attempted to disrupt the January 9 worship service. To the contrary, he sat quietly during the entirety of the service, even turning down his headphones at Ms. Hunter's demand. Rather, this is a coercion case, plain as day, asking simply whether the State unlawfully compelled Mr. Erie to attend a worship service against his will.

Second, and in any event, Mr. Erie has raised a fact dispute even regarding Ms. Hunter's claim that her choices were limited to forcing Mr. Erie to attend church or prohibiting the remaining SFF residents from attending church. Again, ELMHS's *own* investigation concluded that "there was [sic] other options [Ms. Hunter] could have use [sic] to locate other staff to stay with the [residents] who do not want to go to attend the religious services," and that Ms. Hunter's actions violated Mr. Erie's "[r]ight to refuse to attend religious services." (Doc. 21-3 at 1-2; *see* Bertucci Depo. at 17:10-19:8).

The State's attempt to show that Ms. Hunter acted reasonably relies on the wrong law and ignores the operative facts. This case is going to trial.

### 3. There is no *de minimis* exception to the Establishment Clause

Finally, the State insists that even if "Ms. Hunter is not entitled to summary judgment on the basis of qualified immunity, Plaintiff's claims should still be

---

U.S. at 640 (Scalia, J., dissenting); *Town of Greece, N.Y.*, 572 U.S. at 608 (Thomas, J., concurring in part and concurring in the judgment); *Shurtleff v. City of Bos., Massachusetts*, 142 S. Ct. at 1609 (Gorsuch, J., concurring in the judgment).

dismissed as the allegations and evidence show that he has, at most, a *de minimis* impact to his free exercise rights." (Doc. 20-2 at 9). This argument was best left on the cutting-room floor.

First, Mr. Erie is pursuing an Establishment Clause claim, not a Free Exercise Clause claim. (Doc. 1 at ¶ 40).

Second, and in any event, the Fifth Circuit has expressly declined to carve out a *de minimis* exception to the Free Exercise Clause—even in the custodial setting—and has provided no indication whatsoever that such an exception applies to the Establishment Clause. *See Butts v. Martin*, 877 F.3d 571, 586 (5th Cir. 2017) ("Generally, this Court has not required a preliminary showing that a regulation substantially interferes with an inmate's religious rights before assessing whether the regulation is reasonably related to a penological interest."); *see also Newman v. Officer Marfo*, No. 19-cv-352, 2021 WL 3860741, at *5 (S.D. Tex. Aug. 27, 2021) (denying summary judgment on the basis that any injury resulting from alleged Free Exercise Clause violation was *de minimis*: "A *de minimis* analysis may be proper in the context of a claim under the Religious Freedom Restoration Act or the Religious Land Use and Institutionalized Persons Act, but not in a First Amendment free-exercise claim." (citations omitted)).

Third, based on "a historically sensitive understanding of the Establishment Clause," which (again) holds that the State may *not* (1) "make a religious observance compulsory," (2) "coerce anyone to attend church," or (3) "force citizens to engage in a formal religious exercise," Mr. Erie's coerced attendance at a Christian worship

service plainly is not a *de minimis* infringement of his constitutional rights, at least for liability purposes.[6] *See Kennedy*, 142 S. Ct. at 2429 (quotation marks omitted). To the contrary, as explained herein, and in this Court's prior Order denying Ms. Hunter's motion to dismiss, the events in dispute would appear to "fly straight into the teeth of the Establishment Clause's prohibition against state action coercing a person to participate in religion." Erie, 593 F. Supp. 3d at 380 (citing *Lee*, 505 U.S. at 587; *Everson*, 330 U.S. at 15–16).

## III.   CONCLUSION

Accordingly,

**IT IS ORDERED** that Ms. Hunter's **Motion For Summary Judgment (Doc. 20)** be and is hereby **DENIED**.

Baton Rouge, Louisiana, this 31ST day of May, 2023

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[6] Of course, the extent of Mr. Erie's injuries resulting from being forced to attend a one-hour worship service will ultimately inform what damages he may recover. *See, e.g., Warner*, 115 F.3d at 1077 (affirming award of nominal damages for Establishment Clause claim based on probationer's coerced attendance at multiple AA meetings over a period of two years). But quantum of damages is a separate inquiry from a determination of Ms. Hunter's liability, and certainly not a basis for dismissing Mr. Erie's claim at summary judgment. *Cf. Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) ("Because every violation of a right imports damage, nominal damages can redress [a plaintiff's] injury even if he cannot or chooses not to quantify that harm in economic terms." (quotation marks, alterations, and citations omitted)).